# EXHIBIT 1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

AGRO FOODS, INC., a California corporation, )
)
Plaintiff, )
)
vs. ) No. 5:24-cv-02378
) SSS(DTBx)
H&A INTERNATIONAL, LLC, an Indiana limited liability company; ONKAR TRADING, LC, a Pennsylvania limited liability company, and DOES 1 to 50, )
)
Defendants. )
______________________________________)
AND RELATED CROSS-ACTION. )
______________________________________)

DEPOSITION OF SARABJIT BHASIN, Person Most Knowledgable from EVOLUTION ENTERPRISES HOLDINGS, INC. herein, noticed by RAFFERTY & WILLIAMS, LLP, at 120 Vantis Drive, Aliso Viejo, California, at 9:49 a.m., on Friday, March 27, 2026, before Diana Austin, CSR 7375.

Job Number 7988505

APPEARANCES OF COUNSEL:

For Deponent and EVOLUTIONS ENTERPRISES HOLDINGS, INC.:
WOMBLE BOND DICKINSON
BY DREW WILSON
655 Central Avenue, Suite 2300
Glendale, California
drew.wilson@wbd-us.com

For Defendant and Counter-Claimant ONKAR TRADING LLC, a Pennsylvania limited liability company:
RAFFERTY & WILLIAMS, LLP
BY JACK WILLIAMS, IV
120 Vantis Drive, Suite 300
Aliso Viejo, California 92656
jwilliams@raffertywilliamslaw.com

For Defendant and Counter-Defendant AGRO FOODS, INC., a California corporation:
LAW OFFICES OF PHILIP Y. KIM, APC
BY PHILIP Y. KIM
135 South State College, Suite 200
Brea, California 92821
pyklaw@gmail.com

# I N D E X


WITNESS: SARABJIT BHASIN

| EXAMINATION BY: | PAGE |
|---|---|
| MR. WILLIAMS | 4 |
| MR. KIM | 66 |
| MR. WILLIAMS (Confidential Transcript) | 71 |


# E X H I B I T S


| EXHIBIT | DESCRIPTION | MARKED |
|---|---|---|
| EXHIBIT 1 | Deposition Subpoena | 7 |
| EXHIBIT 2 | Intellectual Property Records | 15 |
| EXHIBIT 3 | Assignment of Trademark | 51 |
| EXHIBIT 4 | Paan Bazar | 23 |
| EXHIBIT 5 | Paan Comer | 24 |
| EXHIBIT 6 | Tobacco Packaging | 29 |
| EXHIBIT 7 | Rajiv Kumar Declaration | 38 |
| EXHIBIT 8 | Trademark Name | 45 |
| EXHIBIT 9 | Website Article | 48 |
| EXHIBIT 10 | June 1, 2022 Letter | 63 |
| EXHIBIT 11 | Evolution Enterprises Memo | 67 |
| EXHIBIT 12 | Confidential Exhibit | 71 |

SARABJIT BHASIN,

Person Most Knowledgeable from Evolution Enterprises Holdings, Inc., herein, having been sworn, testifies as follows:

-EXAMINATION-

BY MR. WILLIAMS:

Q. Good morning.

A. Good morning. 09:49

Q. My name is Jack Williams, and I'm the attorney for the defendant in this matter, Onkar Trading, LLC.

Can you state your name for the record, please?

A. Yeah, I'm Sarabjit Bhasin, spelled S-A-R-A-B-J-I-T, last name B-H-A-S-I-N. 09:50

Q. Thank you. And do you understand that you're here to testify on behalf of Evolution Enterprises Holdings, Incorporated?

A. Yes.

Q. Have you ever been deposed before? 09:50

A. A long time ago, maybe, more than ten years ago.

Q. Do you recall if you were deposed in your independent capacity or as a representative of a company? 09:50

A. I think as a representative of a company. 09:50
Q. Okay. Today, should be reminiscent of that experience. I'll explain that the testimony that you give today is regarding the topics that were provided to your counsel, which responses thereto were given. And 09:50 it was your duty to prepare to testify as to those topics and that testimony will bind the company, Evolution Enterprises Holdings, Inc.
Do you understand?
A. Yes. 09:51
Q. I'm going to refer to Evolution Enterprises Holdings, Inc, going forward as Evolution.
A. Sure.
Q. Does that make sense?
A. Sure. Thank you, sir. 09:51
Q. Okay. Is there any reason that you cannot give your best testimony today?
A. No.
Q. What is your position with Evolution?
A. I'm the president of the company and the 09:51 founder of the company.
Q. How long have you held that position?
A. Since its incorporation.
Q. When was that?
A. July of 2009. 09:51

reflecting conversations from the manufacturer? 09:56
A. No.
Q. What did you do to prepare for topic 3?
A. This was both phone and e-mail.
Q. Did you identify any phone or e-mail records? 09:56
A. No.
Q. And topic 4?
A. This, also, we checked both phone and e-mail records, and we didn't find those.
Q. Okay. This one asks for the identity of 09:57 individuals, and on whose behalf those individuals acted, related to the development of the Mark as it appears on the packaging.
Did you identify any individuals?
A. Oh, okay. So in this regards, there was the 09:57 attorney who filed the Mark. His name is Kenneth Green.
Q. Any other person?
A. At that time, we had an employee. His name was Kirti Oberoi. He was, at that time, in communication with the attorney for registering the Mark. 09:57
Q. Can you spell his name, please?
A. Sure. The first name is Kirti, K-I-R-T-I, last name Ober -- could I check to verify his last name?
Q. Please do.
A. Thank you. 09:58

Q. Let the record reflect he's referring to his phone to identify the spelling of the name. 09:58

MR. WILSON: If you don't know, it's okay.

THE WITNESS: Yeah, I don't know the correct spelling. 09:58

MR. WILLIAMS:

Q. Were you texting someone to ask them?

A. I just did a Google search to find his Facebook profile.

Q. Goodness. That's okay. Just spell it. You said Oberoi? 09:59

A. Yeah.

Q. Let's spell it O-B-R-A-I- Does that make sense?

A. I think -- my preference is O-B-E-R-O-I. 09:59

Q. O-B-E-R-O-I. That's acceptable that we're referring to a person.

No other individual that you identify relating to the development of the Mark as it appears on the packaging of Agro's and/or Evolution's product. And I will clarify as product here, I'm referring specifically to UDTA PANCHHI. You need not identify the persons for every product. 09:59

A. There's one more gentleman. His name is Rajiv Kumar, and that is spelled R-A-J-I-V, and then the last 10:00

name Kumar, K-U-M-A-R. 10:00

Q. And I think that we are up to topic 5.

A. Yes, sir.

Q. What did you do to prepare for topic 5?

A. This one I searched in my phone and e-mail records for this. 10:01

Q. Did you identify any phone or e-mail records?

A. Only -- no, there was none.

Q. This one also asked for the identity of individuals. Did you identify any individuals who participated in the process of designing the packaging of products which bear the Mark? 10:01

A. No.

Q. Number 6, what did you do to prepare on this topic? 10:02

A. This was strictly only just phones.

Q. Do you have any phone records that you identified?

A. No.

Q. Are there any individuals that you identify or consult with that participated in the process of marketing products which bear the Mark, the Mark known as UDTA PANCHHI? 10:02

A. Yes.

Q. Who were those persons? 10:02

A. Rajiv Kumar. 10:02
Q. Any others?
A. No.
Q. Topic 7, Evolution's efforts to identify itself to consumers, rather than the manufacturer, as the 10:03 source of product bearing the Mark. What did you do to prepare for that topic?
A. It was searching phone and e-mail records.
Q. Did you identify any?
A. Yes. 10:03
Q. Did you produce any e-mails?
A. I produced the invoices that were used to show that we were the ones selling and marketing the product.
Q. I see. So to clarify, invoices, by the way that I'm interpreting the words, are not e-mails. When 10:04 I say "e-mail," I'm referring to any an e-mail to or from a recipient, an e-mail address reflecting a communication between two or more people.
Do you understand?
A. Would you repeat the question or repeat that 10:04 statement?
Q. What I mean by "e-mail" is a communication from one person to another person or more than another person by e-mail to those persons e-mails reflecting a communication between people. Does that make sense as 10:04

to what an e-mail is? 10:04
A. Oh, okay.
Q. Did you understand that?
A. Yes.
Q. According to the definition, can you identify 10:04
any e-mails?
A. Yes, there was one e-mail, which was -- had a
copy of a cease and desist notice back, I believe, in
2020 to Onkar Trading that the products bearing this
Mark are belonging to Evolution. 10:05
Q. I have looked through your production. I don't
see where you produced any e-mails. I'm aware of the
letter to which you refer, I think, and we'll discuss
that later. But there's no e-mail associated with that
letter in the production. 10:05
Will you agree to produce that document?
A. Yes.
Q. Okay. What did you do to prepare on topic 8?
A. For this we digged out some records that show
that we were testing our products with laboratories to 10:06
make sure that they stayed within our specified HPHC.
These are, like, compounds that are --
Q. I'm going to stop you, sir. I'm trying to do
you a favor here. That document is marked by your
counsel as highly confidential, and you don't need to 10:06

give those details or contents in this portion of the deposition. We'll discuss it later when we're looking at the document -- 10:06
A. Okay.
Q. -- which we'll talk about later. 10:06
A. Yes.
Q. Okay. And topic 9 is Evolution's reasons for why it is or was -- it says "is," is more than a distributor of the manufacturer's products bearing the Mark. What did you do to prepare for that topic? 10:07
A. The reason for -- well, this is, kind of, more that what we know as what we did versus that it requires me to look in my e-mail or search my phone. It is from having run a business that I know what it takes to make and establish a Mark. 10:07
Q. In your response you used the words we and I. When you say "we," to whom do you refer?
A. The company Evolution.
Q. Is there any information as to topic 9 that you, as the president of Evolution, would not know 10:08 arising out of that position?
A. Would you repeat the question?
Q. Is there any information relevant to topic 9 that you, as the president of a company, would not know?
MR. WILSON: Objection; calls for speculation. 10:08

invoices. They appear to be consecutively numbered and proceed generally from earliest date to latest date consistent with the Bates ranges described. Without having me enter all these highly confidential documents and ask about them as exhibits, will you agree that documents produced from the Bates range are all of Evolution's invoices relating to UDTA PANCHHI? 10:10 10:10

A. Yes.

Q. So with that stipulation, we are not going to introduce that large number of documents. 10:10

I'm going to show you what I'm going to identify as 2. There you go.

MR. WILLIAMS: Yes, this one.

MR. KIM: I'm the poor guy over here that gets the leftovers. 10:11

MR. WILLIAMS: I will look over mine.

MR. KIM: I'm the poor guy.

(Whereupon the document referred to is marked by the reporter as EXHIBIT 2 for identification.)

MR. WILLIAMS: 10:11

Q. So these are documents bearing Bates number EEH000001 through EEH000069. Do you understand that the presence of that Bates range on the document means that your lawyer produced those to me in the course of this litigation? 10:12

A. I'm sorry, just going to repeat that my lawyer produced these documents? 10:12
Q. To me.
A. Okay.
Q. Is that -- 10:12
A. I understand that.
Q. Okay.
A. Thank you.
Q. You provided -- did you provide these documents to your lawyer? 10:12
A. No.
Q. Did someone at Evolution provide these documents to your lawyer?
A. No.
Q. Do you have any familiarity with these documents? 10:12
A. Only that I can read them and understand what they are. I have no familiarity with these documents.
Q. Well, I can --
A. I didn't produce them. 10:13
Q. Continue. It's a lengthy set of documents. Take a moment and review them. I can represent to you that my understanding of them is that they're records relating to intellectual property filings for the UDTA PANCHHI Mark that Evolution necessarily would have made 10:13

in the first instance owing to its name being reflected at EEH000022 as the initial registrant and owner of the word Mark UDTA PANCHHI. If you flip to page -- it will be number 22 at the bottom, we'll be looking at the same thing. 10:13 10:14

Do you concur that this is a Patent and Trademark Office Certificate of Registration --

A. Yes.

Q. -- for UDTA PANCHHI?

A. Yes. 10:14

Q. And do you confirm that that name for the company listed immediately below the word UDTA PANCHHI is Evolution Enterprises Holdings, Incorporated?

A. Yes, sir.

Q. Do you agree that these documents, which your attorney produced in this matter, reflect intellectual property records relating to the UDTA PANCHHI Mark? 10:15

A. Yes, sir.

Q. You can set that aside.

Is there any objection to the foundation laid for this document as to these documents being business records of Evolution? 10:15

MR. WILSON: As being business records of Evolution, yes, because I don't believe that Evolution filed all of these documents. I believe there's, like, 10:16

a change of ownership set of documents in here that 10:16
Evolution didn't file.
MR. WILLIAMS: Let's not quite set it aside then
yet.
Q. Let's go to the last page EEH000069. Do you 10:16
see the date of execution on this document of May 4th,
2022, sir?
A. Yes, sir.
Q. And are you familiar with the document?
A. No, sir. 10:16
Q. Do you see that name at the bottom of the
document?
A. Yes, sir.
Q. That is your name, correct?
A. Yes, sir. 10:17
Q. And your title president?
A. No sir, I don't -- yes, sir.
Q. And the signature, is that your signature?
A. No, sir.
Q. Whose signature is that? 10:17
A. It's a signature trying to be my signature.
Q. Are you telling me that this document is a
forgery of your signature?
A. Yes, sir.
Q. Might someone at Evolution have signed this on 10:18

your behalf? 10:18
A. Yes, sir.
Q. But you didn't give authority for anyone to do so?
A. No. 10:18
Q. Let's go to the previous page EEH000068. Are you familiar with this document?
A. No, sir.
Q. This purports to be a Trademark Assignment reflecting a transfer of Mark from -- on the PTO records 10:19 from Evolution Enterprises Holdings -- excuse me, from Evolution to Agro Foods, Incorporated, which I will refer to herein after as Agro with an effective date of July 7th, 2022.
Do you see that? 10:19
A. Yes, sir.
Q. Will you concede that the documents reflected within Exhibit 2 are business records of Evolution prior to the date July 7, 2022?
MR. WILSON: Objection; lack of foundation. I 10:20 don't think he's reviewed all of these documents.
MR. WILLIAMS: He is entitled to -- if you would like to review the documents, feel free to do so. Take as much time as you need, and alternatively, if it's necessary to sit here on the record while he reviews 60 10:20

page of documents, we can. So with counsel's consent, we can go off the record while he does so for 10, 15 minutes to look through these documents. 10:20
Is there any objection to going off the record?
MR. WILSON: I have none. 10:20
MR. WILLIAMS: Okay. We can go off the record.
(A recess is taken.)
MR. WILLIAMS: We can go back on the record.
Q. It's 11:36. We are back on the record in the deposition of Evolution with Mr. Sarabjit Bhasin acting as representative. 10:35
Do you understand that you're still under oath from this morning?
A. Yes, sir.
Q. Before we took a break, you were going to review documents that I provided to you identified as Exhibit 2, Bates numbers EEH1 through 69. The last question I asked was, I think, whether you would acknowledge that documents predating -- 10:36
MR. WILSON: We can go by Bates ranges, if that's easier. 10:36
MR. WILLIAMS:
Q. -- predating July 7, 2022, were business records of Evolution. Do you remember that?
A. Yes, sir. 10:37

Q. After having read the documents, will you make that concession? 10:37

A. Page ranges of EEH000001 through EEH00020, those would not be Evolution's records. EEH00021 through EEH000067 would be Evolution's records. And 10:37 EHH000068 through 69 would not be Evolution's records.

Q. I want to make sure I got that correctly, 0120 are not Evolution's records?

A. That's correct, sir.

MR. KIM: What are the Bates ranges, I apologize, 10:39 that were not Evolution's?

THE WITNESS: On this set from ending in 01 to 20. From the first set it is from 01 to 20. And then Evolution documents would be from 21 through 67.

MR. KIM: Okay. Thank you. 10:39

MR. WILLIAMS:

Q. So I identified Exhibit 2 as that entire Bates range. There is no foundation for 01 through 20 because they're not your business records and you're not familiar with them. I don't normally have to do this at 10:40 a deposition. So I would move to admit, based on foundation Exhibit 2 as only Bates numbers 21 through 67. Is that clear to everyone?

MR. WILSON: Yes. That's the new Exhibit 2 --

MR. WILLIAMS: The admissible Exhibit 2. 10:40

MR. WILSON: It if helps, I can represent that my firm downloaded this from the United States Patent and Trademark office this exhibit and produced it from the United States Patent and Trademark office's records. 10:40

MR. WILLIAMS: Okay. Thank you. 10:40

Q. 001 through 20 are no longer part of Exhibit 2 based on the foundation issues we discussed. And further, 68 and 69 are no longer part of Exhibit 2 based on what we discussed. However, I will now identify to you as Exhibit 3 Bates numbers 68 and 69. 10:41

Although you're not familiar with the document, you can verify -- you verified earlier that that is your name and your title at the bottom of that page, correct?

A. Yes, sir.

Q. And that's not your signature? 10:41

A. That's correct, sir.

Q. Even though you can't identify the document, you can testify as the document is not a document you have ever seen before?

A. That's correct, I can, sir. 10:41

Q. And that reflects your signature that is not your signature?

A. Correct.

MR. WILLIAMS: I think that's foundational for this document. Even though he hasn't -- isn't familiar with 10:42

the document, he is competent to testify whether it contains his signature or not. Therefore, that's an appropriate exhibit and not objectionable. 10:42

MR. WILSON: No objection made.

MR. WILLIAMS: Okay. So do the best you can to separate those out as we discussed them because we'll probably refer back to them. 10:42

MR. WILSON: We can set them aside for now.

MR. WILLIAMS: Yes, set them aside for now.

Q. I'm going to show you a document that we're going to identify as Exhibit 4. 10:43

This document is three pages.

Does everybody have three pages?

MR. WILSON: Yes, sir.

(Whereupon the document referred to is marked by the reporter as EXHIBIT 4 for identification.) 10:43

MR. WILLIAMS:

Q. It's EEH0800 through 802. Can you just tell me what this is.

A. These are three pages. 10:44

Q. Are you familiar with this document, by the way? Are you familiar with this document or its contents?

A. Yes, sir.

Q. Okay. Having familiarized yourself with the 10:44

document and its content, do you recognize this document 10:44
and what it reflects?

A. It reflects the website of Paan Bazar, Udta
Panchhi.

Q. Why did you -- why did you produce this 10:44
document in this litigation?

A. To show the brand that was being marketed, and
it's packaging.

Q. I understand. So these documents go to the
marketing topics that we discussed at the beginning of 10:45
the deposition?

A. Yes.

Q. Okay. You can set that aside. I'm going to
provide you another document. We're going to call this
one Exhibit 5 for the Evolution deposition. Take a 10:45
moment and review the document. It's three pages
EEH000803 through 805.

Are you familiar with that document?

A. Yes, sir.

(Whereupon the document referred to is marked by 10:46
the reporter as EXHIBIT 5 for identification.)

MR. WILLIAMS:

Q. And what does it reflect?

A. It reflects the image of UDTA PANCHHI with the
expiration date of October 2017. 10:46

to buy the product or making deals. For example, Evolution imports and distributes other tobacco products and so making cross bulk deals, for example, buy one get one free, buy this brand, get this other brand for free. 10:49

Q. Is it fair to say what you're describing as selling the product at a discount to get the product on the shelves and to consumers? 10:50

A. Yes, sir.

Q. Those discounts, were they provided to your distributors? 10:50

A. Yes, sir.

Q. And was there instruction to the distributors to then offer it cheaply or were the distributors able to set the price that they charged to retailers?

A. The distributors set their own prices, dependent upon the region and competition that they are faced with the other brands. 10:50

Q. For the period of time that Evolution has sold this product, what efforts has Evolution made to identify itself as the source of the product? 10:51

A. That we were the exclusive importer, distributor, trademark owner of the brand, and where you could only purchase this product was from Evolution.

Q. Who did you tell that to? Who would know that based off anything you've done? 10:52

A. The distributors that we deal with across the 10:52
United States are limited in number, and there is only just a handful of distributors that we now work with. So through that limited distribution channel is how they would know to purchase the product through us, and that 10:52
we were the authentic source.

Q. Is there any way that a consumer of this product, an end user, a spit tobacco enjoyer could identify Evolution as being associated with this product? 10:53

MR. WILSON: Objection; calls for speculation.

MR. WILLIAMS:

Q. You can answer.

A. Honestly, I don't know.

Q. Okay. I'm going to show you another document. 10:53
I think that we are up to Exhibit 6. I only have three total copies of this one. I'm going to look at my computer. You saw this one yesterday.

MR. KIM: I did.

MR. WILLIAMS: Yes. I'm going to give you the best 10:53
color copy.

THE WITNESS: Thank you.

MR. WILSON: There you go.

MR. KIM: That's how that is.

MR. WILLIAMS: If you would spread those out in 10:53

packaging of what Evolution used to sell. 10:59

Q. You said Evolution used to sell, correct?

A. Yes.

Q. Does Evolution not sell this product now?

A. Correct. 10:59

Q. Who sells this product?

A. Agro Foods sells this product.

Q. Can you describe for me what Agro Foods rights are to sell this product in light of your having testified earlier that you did not recognize a document 11:00 purporting to transfer the UDTA PANCHHI Mark to Agro?

MR. WILSON: Objection; calls for a legal conclusion.

MR. WILLIAMS:

Q. You can answer. 11:00

A. Rajiv Kumar was also inside the same building where Evolution was, and he used to be a salesman for the company. And when in 2023, he left this facility of where we were together. So we have made some division of products that I'll sell these products; you can sell 11:01 these products. So that way there isn't a cross competition in this market that would, you know, destroy the marketing of these brands.

Q. Mr. Rajiv, based off what you're saying, has permission from Evolution to sell UDTA PANCHHI? 11:01

A. Yes. 11:01
Q. Is there a document reflecting that permission?
A. Not that I'm aware of.
Q. Can you describe for me the terms of the permission you're talking about now? 11:02
A. So Evolution was importing about 15 to 20 different brands of tobacco and looking at the overall revenue of those items, we split that Evolution continue marketing X items and Agro Foods would go and market X number of items, so then that way they would blend out 11:03 to be, you know, representative of being able to continue the sales efforts to keep these brands going in the market.
Q. As a businessman, are you familiar with the concept of a license agreement? 11:03
A. Yes.
Q. Can you describe for me what a license agreement does?
A. It would give somebody the right to use and market an item. 11:03
Q. And sell that item as well, correct?
A. Yes, sir.
Q. It sounds to me like what you're describing between Evolution and Mr. Ravjiv can be characterized as a license agreement; is that correct? 11:04

MR. KIM: I'll object. It calls for a legal conclusion, calls for speculation. 11:04
MR. WILLIAMS:
Q. You can answer.
A. Yes, sir. 11:04
Q. So a license agreement is a type of contract and contracts have terms. Can you describe for me the terms of the license agreement?
MR. KIM: Same objections.
MR. WILLIAMS: 11:04
Q. You can answer.
A. It is a verbal -- we had just a verbal agreement.
Q. Verbal agreement to what?
A. That he could sell and market the item, the brand UDTA PANCHHI in this case. 11:04
Q. For how long?
A. We never set any verbal term for that, just only based on presumed assumptions that he can market it until he doesn't want to market it anymore. 11:05
Q. Did he pay you anything in order for the right to sell goods bearing the UDTA PANCHHI mark?
A. No.
Q. Is it geographically limited?
A. It would be limited to the United States of 11:06

where the trademark is registered. 11:06
Q. Is it assignable?
MR. KIM: I'm going to object; calls for a legal conclusion, calls for speculation.
MR. WILLIAMS: 11:06
Q. You can answer.
A. Assignable meaning?
Q. If Mr. Rajiv wanted to take his license and give it to someone else and have them have the license, could he do so? 11:06
A. No.
Q. But was that a term of the agreement that you did discuss that issue?
A. It was understood only that Agro Foods could use the Mark, and that was it. 11:06
Q. So going back to the document in front of you, as to Agro 000079, is it your testimony that you don't recognize that side of the packaging?
A. That's correct.
Q. And how long did Evolution import and sell this 11:07 product?
A. From 2016 to 2022.
Q. And during all that time, you never looked at both sides?
MR. WILSON: Objection; misstates testimony. 11:07

MR. WILLIAMS: 11:07
Q. You can answer.
A. That's correct. I was focused more on some other items and pushing it in the market.
Q. Is there anywhere on this packaging that you 11:08 think indicates to a consumer of the product that Evolution is associated with this product?
MR. WILSON: Objection; calls for speculation.
MR. WILLIAMS:
Q. You can answer. 11:08
A. No.
Q. If a customer calls phone number 09354404713, does Evolution pick up the phone?
A. No, sir.
Q. And if a customer e-mails shivtobacco01, that's 11:09 S-H-I-V-T-O-B-A-C-C-O 01@ gmail.com, does Evolution answer?
A. No, sir.
Q. And if a customer sends an e-mail to arthitindustries01@gmail.com, 11:09 A-R-T-H-I-T-I-N-D-U-S-T-R-I-E-S 01@gmail.com, does Evolutions get that e-mail?
A. No, sir.
MR. WILSON: Object to vague as to time period when this package was made. 11:10

When Mr. Rajiv traveled to India, did he do so as a representative of Evolution? 11:17
MR. WILSON: Objection; lacks foundation.
THE WITNESS: That is pure speculation that even if he traveled to India in April of 2016, I wouldn't know that. 11:18
MR. WILLIAMS:
Q. Do you have any reason to believe that he did?
A. No.
Q. Did any other representative of Evolution travel to India to find a manufacturer who could make UDTA PANCHHI in or around March or April of 2016? 11:18
A. No.
Q. I'm asking you here because I think at this time, Mr. Rajiv -- Rajiv Kumar, who I will refer to as Mr. Rajiv, was an employee of Evolution, correct? 11:18
A. He was not an employee of Evolution.
Q. Who was he employed by at that time, if you know?
A. He was employed by himself as an independent contractor. 11:19
Q. Was it Mr. Rajiv's idea to start selling UDTA PANCHHI in the United States?
A. Not solely, no.
Q. Who else participated in that idea? 11:19

A. Myself. 11:19
Q. Tell me about coming up with the idea to sell UDTA PANCHHI. Did you have in mind a manufacturer when you developed the idea to sell in the United States?
A. We know most of the manufacturers having been 11:20 in business for a long period of time and the niche product that tobacco is within India. So Evolution has built up a reputation to know who are the significant players who manufacture tobacco in India. And so there is a handful of people that could manufacture the 11:21 product based upon product inputs and the capability for manufacturing the goods. So there's just a handful of people that we could go to make the product.
Q. When you decided that you wanted to sell UDTA PANCHHI in the United States, did you have a particular 11:22 manufacturer in mind to go to source UDTA PANCHHI?
A. Yes.
Q. Who was that?
A. The Shiv Tobacco.
Q. And why did you think that Shiv Tobacco would 11:22 be an appropriate manufacturer?
A. Because they have had history in India of developing, selling being able to keep up with the production for the tobacco brands that they work with.
Q. Did you know Shiv already was manufacturing a 11:22

product bearing the name UDTA PANCHHI? 11:22
A. No.
Q. Paragraph 16 of Mr. Rajiv's declaration says, "On or about April 2016, I met Vineet Kumar Agarwal."
Do you know who that is? 11:23
A. I would have to check my phone records, but I think that the owner is Vineet Kumar.
Q. In this declaration Vineet Kumar Agarwal -- that's spelled V-I-N-E-E-T, K-U-M-A-R, A-G-A-R-W-A-L. You mentioned a name Vinood, can you spell that, please? 11:24
A. V-I-N-O-O-D.
Q. Mr. Rajiv goes on to say in the declaration, "I told Vineet that I filed the Mark in the United States and that I wanted Vineet to provide Evolution with samples of chewing tobacco and also the packaging for 11:24 the chewing tobacco."
Did Shiv provide samples to Evolution?
A. When we developed the product, there were different sachets that had different flavor profiles and that's the only items that I would have received. 11:25
Q. Paragraph 19 in the declaration, Mr. Rajiv said, "I had an exclusivity agreement with Vineet as the owner of Shiv. This agreement was verbal. Before I placed any orders from Shiv, Vineet agreed that he would sell -- he would not sell to any other wholesalers or 11:25

retailer in the United States since Evolution was the trademark owner of a Mark in the United States. He obviously reneged on that promise." 11:25

Do you know anything about this exclusivity agreement that I just described? 11:26

A. No, sir.

Q. Had Mr. Rajiv, as he testified, entered into an exclusivity agreement with Mr. Vineet or any other representative of Shiv, that agreement would be between Evolution and Shiv, correct? 11:26

MR. KIM: I'm going to object as calling for speculation.

MR. WILLIAMS:

Q. You can answer.

A. Had he, yes. Then yes. 11:26

Q. Because Mr. Rajiv was Evolution's agent to the extent that he had any contact with Shiv around the time that we are discussing, right?

A. Correct.

Q. You testified that you aren't aware of any exclusivity agreement individually, is that right, between Shiv and Evolution? 11:27

A. That's correct, sir.

Q. What about Shiv and Mr. Rajiv?

A. I wouldn't know about an exclusivity agreement 11:27

between Rajiv and Shiv. 11:28

Q. So far as you're aware, Shiv is not prevented from selling this product to other parties?

MR. WILSON: Objection; misstates testimony and incomplete hypothetical. 11:28

MR. KIM: Calls for a legal conclusion.

MR. WILSON: That too.

MR. WILLIAMS:

Q. You can answer.

A. Since Evolution is the trademark owner in the United States, Evolution would be the party to market the product in the United States. 11:28

Q. But does Evolution -- did Evolution ever have any right to tell Shiv that it could not sell to whomever it wanted? 11:29

MR. WILSON: Same objections.

MR. KIM: Calls for a legal conclusion, calls for speculation, lacks foundation.

MR. WILLIAMS:

Q. You can answer. 11:29

A. If Shiv did that, then Evolution would seek a different manufacturer.

Q. Other than withdrawing from Shiv and seeking another manufacturer, what else might Evolution do to stop Shiv from doing what it's doing -- or assuming that 11:29

E-V-O-L-U-T-I-O-N-E-N-T-P-1-9-8-0@gmail.com. 13:05
A. That's in reference to which time period?
Q. In 2023.
A. It would be Nimita Shah, spelled N-I-M-I-T-A, last name S-H-A-H. 13:06
Q. What does Nimita Shah do for Evolution?
A. She was previously, like, an account keeper, document record keeping and those types of things.
Q. Are you aware that I had a meeting with Mr. Gurbax Bhasin in around November of last year? 13:07
A. Yes, I am aware that you guys had a meeting.
Q. Did he discuss any of that meeting with you?
A. No.
Q. Did you talk to him about that meeting?
A. No. 13:07
Q. Would you be surprised to hear that he said that a pricing agreement between -- with Onkar would resolve any disputes with Onkar?
A. No.
Q. That wouldn't surprise you? 13:08
A. No, I don't know any discussion that you had with him or what the context of that discussion was. And to be surprised means I don't have any comment what to be surprised about.
Q. Okay. Do you know who formed Agro Foods? 13:08

A. Yes. 13:09
Q. Who did?
A. Gurbax Bhasin.
Q. And does Gurbax -- Mr. Gurbax have any continuing ownership in that company? 13:09
A. No.
Q. As far as you know, the only owner of that Agro Foods Incorporated, Agro is Mr. Rajiv?
A. Yes, sir.
Q. When did Mr. Rajiv take full ownership of Agro? 13:09
A. I would be guessing.
MR. WILSON: Don't guess.
THE WITNESS: I don't know.
MR. WILLIAMS:
Q. You shouldn't guess. Was it after 2010? 13:10
A. Yes.
Q. Was it after 2015?
A. Yes.
Q. Was it between 2015 and 2020?
A. I don't know. 13:10
Q. Do you know if it was after 2020?
A. Yes, should be after 2020.
Q. I think you discussed earlier or mentioned earlier a time where Agro and Evolution agreed to -- that Agro would sell certain products and Evolution 13:11

would sell certain products. 13:11
When was that?
A. That was between 2022 and 2023.
Q. Did Evolution transfer to Agro any trademarks arising out of that agreement to split up products? 13:11
A. No.
MR. WILSON: Objection; vague as to "transfer." Calls for a legal conclusion.
MR. WILLIAMS:
Q. Your answer is no, correct? 13:11
A. Correct.
Q. Did Mr. Rajiv take ownership of Agro during the transitional period between 2022 and 2023 that we are discussing?
MR. WILSON: Objection; calls for speculation. 13:11
THE WITNESS: I don't know.
MR. WILLIAMS:
Q. Who came up with the name UDTA PANCHHI?
A. This name has been circulating in this market for a period of time, and there was somebody else who 13:12 was marketing a brand called UDTA tobacco, and there was another company who had another tobacco name, which was called Panchhi Chop in India. So the origin of the name came from merging these two together that Shiv people had come up with. 13:13

Q. Do you know when Shiv came up with that? 13:13
A. I don't know the exact date, no.
Q. Was it before 2016?
A. Yes.
Q. Before 2015? 13:13
A. Yes.
Q. Before 2010?
A. That, I don't know. That could be too early.
Q. Do you think it was between 2010 and 2015?
A. Yes. 13:14
Q. Was that name already in use in India before 2016?
MR. WILSON: Objection; vague as to "already in use."
MR. WILLIAMS: 13:14
Q. You can answer, if you understand.
A. I didn't see, but this is what, you know, ideas came. There was a few different names that were being tossed around to developing a product.
Q. Who designed the logo for the packaging? 13:15
A. Shiv Tobacco.
Q. Shiv Tobacco designed the flying bird emblem?
A. As it pertains to this (indicating), yes.
Q. Let the record reflect that he's referring to -- 13:15

A. The packaging. 13:15
Q. Yeah, Evolution Exhibit 6, which is identical to Agro Exhibit 9.
MR. WILSON: Bates 000079.
MR. WILLIAMS: 13:16
Q. Who decided to file the trademark application for the Mark that is the subject of this dispute?
A. In the United States?
Q. Yes.
A. It was my decision to file the trademark. 13:16
Q. Who hired the trademark attorney?
A. I hired the trademark attorney.
Q. I think you testified earlier that it was Mr. Ken Green or Kenneth Green?
A. Yes, sir. 13:17
Q. Who paid the legal fees for the trademark application?
A. Evolution paid the fees.
Q. Who supplied the specimen that was used in the trademark application? 13:17
A. Evolution.
Q. If we could go to Exhibit 2 at page 33. The largest stack of paper in front of you.
Does that reflect the specimen that was submitted for the trademark application? 13:19

MR. KIM: What's the next exhibit? 13:50
MR. WILSON: Eleven.
MR. KIM:
Q. I'll put that in front of you. Here's your copy. Have you ever seen this document before? 13:50
A. No, sir.
(Whereupon the document referred to is marked by the reporter as EXHIBIT 11 for identification.)
MR. WILLIAMS:
Q. The signature that's on -- it purports to be a 13:50 document on Evolution Enterprise Holdings, Inc. letterhead which acknowledges that Evolution Enterprises, Inc, transferred the trademark UDTA PANCHHI to Agro Foods, Inc, in the year 2022. And so anyway, the signature there, that's the signature of Gurbax 13:51 Bhasin, your father?
A. Yes, sir.
Q. Did he tell you that on October 27, 2025, that he had signed and issued a letter as the one that you're seeing in front of you? 13:51
A. No.
Q. Okay. Would it surprise you, as you sit here today, that your father had signed a document that pretty much affirms the trademark transfer that occurred in 2022? 13:52

A. Surprise means that -- like, should I be 13:52
shocked that he did this or means --
Q. Yeah.
A. -- I'm not going to get exited or unexcited.
Q. Sure. Not excited but is what he's saying on 13:52
here contrary to your understanding?
A. Yes.
Q. And what is your understanding?
A. My understanding is that I never authorized the
transfer of Evolution trademark to any company. 13:52
Q. What position does your father hold in the
company?
A. He's a shareholder.
Q. So does he have any authorization as a
representative of -- official representative of 13:52
Evolution?
A. No.
Q. The address that's shown at the bottom, is that
the address for Evolution Enterprises?
A. Yes, sir. 13:53
Q. Okay. Do you have any doubt that this was
signed and created by your father?
MR. WILSON: Objection; lack of foundation.
MR. WILLIAMS: Objection; speculation.
MR. WILSON: Also calls for speculation. 13:53

MR. KIM: 13:53
Q. If you know?
A. Yeah, I don't know.
MR. KIM: I have no other questions. Thank you very much. 13:53
MR. WILLIAMS: You can have mine.
MR. KIM: Actually, I do apologize. One more question just before we move on.
MR. WILSON: I'm going to object to this document as not having been produced thus far in this litigation. 13:54
MR. KIM: So stipulated.
MR. WILLIAMS: Go ahead.
MR. KIM:
Q. The question is going back to the assignment and you testified that -- not that assignment, the 13:54 official -- yeah, right in front of you, the assignment, the second page, right, you said that was not your signature. Is it possible that was your father's attempt to sign your signature?
MR. WILSON: Objection; calls for speculation. 13:54
MR. WILLIAMS: Same objection.
MR. KIM:
Q. If you know.
A. I'm sure that's not my father's attempting to make my signature. 13:55

Q. How do you know? 13:55
MR. WILLIAMS: Objection; asked and answered.
THE WITNESS: The writing over here (indicating), this is Rajiv Kumar's handwriting.
MR. KIM: 13:55
Q. And you recognize it because you know his signature -- his handwriting?
A. Yes.
MR. KIM: No further questions.
MR. WILLIAMS: Without needing to go off the record 13:55 again, we can now transition the deposition to the highly confidential portion of this to be separately bound.
Any objection?
MR. WILSON: No, no objection. 13:56
MR. KIM: No objection.
MR. WILLIAMS: Ms. Reporter, we are ready to proceed.
(Counsel stipulated pages 71 and 72 are confidential and are excerpted from the test of the transcript.) 13:56
///
///
///
///
/// 13:56

-EXAMINATION- 13:56

BY MR. WILLIAMS:

Q. So Mr. Sarabjit, I'm going to show you a document, and I have one, two, three. Regarding 13:56 identifying this document, we are up to 12. I'm going to go ahead and mark it next in order as Exhibit 12. It is one page bearing Bates number EEH000072.

Mr. Sarabjit, please tell me what this is?

A. This is a test report for tobacco product that 13:57 checks for HPHC.

(Whereupon the document referred to is marked by the reporter as EXHIBIT 12 for identification.)

MR. WILLIAMS:

Q. What's HPHC? 13:57

A. These are particles of heavy metals and those kinds that any brand should monitor to verify that their product doesn't have high levels of heavy metals or other things that could get your product into trouble with the FDA. 13:58

Q. Do you see where it says, "Issued to"?

A. Yes.

Q. Who is MS Foodco Exports, Pvt. Ltd.?

A. They are an agent in India.

Q. And agent of whom? 13:58

REPORTER'S CERTIFICATION

I, Diana Austin, CSR, 7375, Certified Shorthand Reporter in and for the State of California, do hereby certify:

That the foregoing witness was by me duly sworn; That the deposition was then taken before me at the time and place herein set forth; that the testimony and proceedings were reported stenographically by me and later transcribed into typewriting under my direction; that the foregoing is a true record of the testimony and proceedings taken at that time.

I further certify that pursuant to FRCP Rule 30(e)(1), before completion of the deposition, review of the transcript [x] was [ ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have subscribed my name on this date: April 17, 2026.

DIANA AUSTIN, CSR 7375

I declare under penalty of perjury that the foregoing is true and correct. Subscribed at ______________, ______________, this______day of ______________, 20___.

____________________________

SARABJIT BHASIN